## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GENNADIY NEKRILOV, EUGENE NEKRILOV, KWAN HO TANG, JAYU JEN, and ALEN SUEN**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**CITY OF JERSEY CITY**<br><br>        **Defendant.** | Civ. No. 19-22182 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs are individuals who operate short-term rentals in Jersey City. In 2015, Jersey City passed an ordinance affirmatively permitting short-term rentals in the City. In 2019, however, the city passed another ordinance which limited such rentals. The 2019 ordinance, among other things, banned the practice of subletting long-term lease properties as short-term rentals and limited non-owner-occupied properties to hosting no more than sixty nights of short-term rentals per year. The effect of this new ordinance has been to significantly impair the plaintiffs' short-term rental businesses.

Plaintiffs bring this suit pursuant to the Takings, Contract, and Due Process Clauses of the United States Constitution, seeking an injunction and monetary damages. Jersey City has opposed the motion for a preliminary injunction and moved to dismiss the complaint for failure to state a claim. For the reasons stated in this opinion, I will **GRANT** the motion to dismiss and **DENY** the motion for a preliminary injunction.

## I.     BACKGROUND[1][2]

Plaintiffs operate short-term rentals which they market through online home-sharing platforms. Home-sharing platforms permit individuals to lease or sublease properties they own for days, weeks, or months at a time. (Compl. ¶ 18.) The property owner creates a listing on the home-sharing platform offering the property as a rental, and prospective tenants are then able to select the listing and enter a short-term rental contract with the property owner. The platforms do not offer their own properties, but rather function as brokers, and collect commissions for transactions executed by their users.

Short-term rentals offered through home-sharing platforms tend to compete with hotels, but offer a more residential setting, because they are typically located in residential properties in neighborhoods. (*Id.* ¶¶ 17–18.) The largest home-rental platform is Airbnb, which Plaintiffs used to rent out their properties in this case. (*Id.* ¶ 19.) There are numerous other home-sharing platforms, however, which are equally subject to Jersey City's short-term rental restrictions.

### A. Plaintiffs

Plaintiffs all operated numerous short-term Airbnb residences in Jersey City. They did so via two methods. The first was that each plaintiff purchased a

---

[1]     Certain key items from the record will be abbreviated as follows:

DE __                 =        Docket entry number in this case

Compl.                =        Complaint (DE 1)

[2]     Facts cited below, unless otherwise noted, are derived from the Complaint and thus are accepted as true, with all reasonable inferences drawn in the plaintiffs' favor. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). Additionally, attached as Appendix A is a chart which sets forth the economics of each property owned by the plaintiffs; all information in that Appendix is derived from the Complaint, but placed in chart form for ease of comprehension.

property (or properties) and offered short-term rentals of that property through Airbnb. (*Id.* ¶¶ 121, 132 (Gennadiy and Eugene Nekrilov), ¶ 204 (Kwan Ho Tang and Jayu Jen), ¶¶ 251, 255 (Alan Suen).) The second was that the Nekrilovs, Tang, and Jen, but not Alan Suen, all entered into long-term leases with other property owners and then, with those property owners' permission, sublet those leases as short-term rentals through Airbnb. (*Id.* ¶¶ 111–15 145–152, 189, 194.)

The plaintiffs each allege that they chose Jersey City as a location to focus their short-term rental business due to the City's enactment of ordinances permitting short-term rentals and its efforts to advertise those ordinances. (*Id.* ¶¶ 105, 185, 233–35.) They claim that they are unable to make a profit from their owned and leased properties unless they are permitted to continue exploiting them as short-term rentals.

### B. Jersey City's Rental Ordinances

Jersey City has passed two rental ordinances relevant to this dispute. The first, in 2015, legalized short-term rentals in the City, subject to certain conditions; the second, in 2019, imposed quite significant restrictions on such rentals.

Steven Fulop was elected Jersey City's mayor in 2013. (*Id.* ¶ 28.) After his election, Mayor Fulop began a public relations campaign designed to draw development and young professionals into the city. (*Id.* ¶¶ 29–30.) As a part of his development plan, the Mayor supported an ordinance which would affirmatively permit home-sharing platforms such as Airbnb in Jersey City. (*Id.* ¶ 33.) The ordinance was to be the first of its kind in New Jersey. (*Id.* ¶ 34.)

The ordinance, Ord. 15.137, stated:

1. Short Term Rentals are permitted as an accessory use to a permitted principal residential use in all zoning districts and redevelopment plan areas where residential uses are permitted.

    a. The person offering a Dwelling Unit for Short-Term Rental use must be the owner or lessee of the residence in which the Short-Term Rental activity occurs. Short-Term Rental activity

> may occur in a habitable accessory building located on the
> same premises as the residence.
>
> b. No person offering a Dwelling Unit for Short-Term Rental use
> shall be required to obtain any license for such use . . . unless
> such person offers more than 5 separate Dwelling Units for
> Short-Term Rental use in the City. Any person offering more
> than 5 separate Dwelling Units for Short-Term Rental use in the
> city must:
>
> > i.  Obtain a license pursuant to Section 254-82 . . . .
> >
> > ii. Ensure that the Short-Term Rental use is clearly
> > incidental to the principal residential uses permitted in
> > the zone where each such Dwelling United is located . . . .
>
> . . . .
>
> d. The Short-Term Rental use shall be conducted in a manner that
> does not materially disrupt the residential character of the
> neighborhood.

Jersey City Ord. 15.137. The proposal of the ordinance was accompanied by a press release. The press release stated that Ordinance 15.137 would "make Jersey City the first city in the Tristate area to formally embrace the popular home-renting platform [Airbnb] by permitting city homeowners and certain lessees to rent their home for less than 30 days." (*Id.* Exh. 3.) The press release also stated that "the measure . . . includes several commonsense protections. It would prohibit homeowners and renters from 'changing the character of the neighborhood.' It would also limit the number of properties one user could rent on the platform to five, so as to prevent the formation of informal 'Airbnb hotels.'" (*Id.*)

In addition to the press release, Mayor Fulop made numerous public remarks stating that he would prefer to work with, rather than against, Airbnb, and that he hoped Jersey City would be a leader on home-rental platforms in the Tri-State area. (*Id.* ¶¶ 40–41.) He said Airbnb was the "future" of Jersey City's economy and that "while some people might have concerns about the sharing economy upending old ways of doing business, the best way to address

4

those concerns is by engaging with these companies, not pretending they do not exist." (*Id.* ¶ 42.) He wrote an article in Huffington Post stating that Jersey City would embrace Airbnb and "make change our friend." Steven Fulop, *Why Jersey City Will Allow Airbnb*, HuffPost, Oct. 19, 2015, https://www.huffpost.com/entry/why-jersey-city-will-allo_b_8331016.[3]

Mayor Fulop observed that permitting Airbnb rentals would allow "middle-class folks [to] earn a bit of extra income by renting out their apartments," noting that the City could not realistically police Airbnb rentals in any event. *Id.* He noted, however, that Ordinance 15.137 included "common-sense ground rules: people can't rent out so many rooms as to create an informal hotel; they can't change the nature of the neighborhood[,]" and Airbnb would be obligated to pay a hotel tax. *Id.* Other Jersey City officials also praised the ordinance as allowing the city to expand its tourism industry. (Compl. ¶¶ 45–46.) The ordinance was unanimously approved by the Jersey City Council on October 28, 2015, and signed into law by Mayor Fulop on October 30, 2015. (*Id.* ¶ 47 & Exh. 2.)

In 2016, Mayor Fulop reportedly approached Airbnb and sought a contribution towards his reelection campaign. Luis Ferre-Sadurni, *Where a $5 Million War Rages Between Airbnb and the Hotel Industry*, The New York Times, Oct. 30, 2019, https://www.nytimes.com/2019/10/30/nyregion/jersey-city-airbnb-vote.html (referenced in the Complaint at paragraph 58). The next year, Fulop attended a fund-raising event at the company's headquarters in San Francisco. *Id.* A donation apparently was not forthcoming, so Mayor Fulop emailed Airbnb expressing his frustration. *Id.* Twelve days later, Airbnb made a

---

[3]     This article, along with the other articles referenced in this section, were cited by the complaint and as such were incorporated by reference. (Compl. ¶ 43); *In re Asbestos Products Liability Litig.*, 822 F.3d 125, 134 n.7 (3d Cir. 2016) ("In deciding motions under Rule 12(b)(6), courts may consider 'documents integral to or explicitly relied upon in the complaint,' or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'") (cleaned up); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

$10,172 contribution. *Id.* Four months after that, the Hotel Trade Council began donating to Mayor Fulop's joint committee, in an amount totaling $33,200 since late 2017. *Id.* Two years later, Mayor Fulop's office initiated Ordinance 19-077, which imposes significant restrictions on short-term rentals in Jersey City.

Ordinance 19-077, while not banning short-term rentals, imposed important new restrictions. First, it barred short-term rentals in non-owner-occupied dwellings in excess of a total of 60 nights per year. (Compl. Exh. 1.) Second, it no longer permitted short-term rentals as subleases; that is, only property owners were permitted to rent their property on a short-term basis. (*Id.*) To those restrictions, there were some exceptions. As relevant here, the ordinance provided for a transition period of approximately 18 months; through January 1, 2021, it exempted (*i.e.,* allowed) short-term rental bookings initiated prior to its effective date of June 25, 2019. (*Id.*) The Ordinance also imposed permitting and registration fee requirements, and created a Division of Housing Preservation, which was empowered to enforce the short-term rental limitations set out by the ordinance. (*See generally id.*)

The Jersey City Council held a special meeting to vote on Ordinance 19-077 on June 25, 2019. (*Id.* ¶ 63.) Several members of the City Council spoke in favor of the ordinance at the meeting. Councilman James Solomon stated that he supported the ordinance, for the following reasons:

> [T]here [are] also people who have been harmed by the introduction of Airbnb and there have been people representing trade unions here and I don't apologize for being a proud supporter of unions in a progressive city. That's part of what the word progressive means. And those people can be hurt as well by the introduction of short-term rentals and their expansion.

(*Id.* ¶ 66.)[4] Councilman Jermaine D. Robinson stated that he understood short-term rental operators would lose money. That, he stated, was "the last thing

---

[4] The plaintiffs cite to a video recording of the Council meeting which captures Councilman Solomon's statements, available on Youtube at

that [he] want[ed] to do," and he "apologize[d] to anyone who's going to lose some money. Hopefully this is not going to get out, I mean, get out of hand and that you guys can recoup some of your money." (*Id.* ¶ 67.) The City Council then voted 7 – 2 in favor of the ordinance. (*Id.* ¶ 69.) Three days later, on June 28, 2019, Mayor Fulop signed Ordinance 19-077 into law. (*Id.* ¶ 70.)

### C. Effect on the Plaintiffs

Before Ordinance 19-077 was passed, each plaintiff made significant investments in Jersey City real estate, for use in the business of short-term, Airbnb-style rentals. Some of those investments consisted of purchases of properties. The rest consisted of long-term leases; the terms of those leases are not specifically stated, but the Complaint alleges that most will end in 2020 and 2021. (*See, e.g.*, Compl ¶¶ 111–15, 146, 149, 191, 197.)

Gennadiy and Eugene Nekrilov entered into long-term leases for seventeen different properties, and purchased two properties, to host their short-term rentals. In each property, they earned much more via short-term leases than they could have done by renting them out with long-term leases. In the long-term lease properties, for example, they paid long-term rents totaling $36,250 per month, and earned an average of $71,837 per month subletting them short-term. (*See* Appendix A.) The two purchased properties have mortgages of $2,500 and $1,725 per month, and they earned $9,500 and $5,183 per month as short-term rentals. (Compl. ¶¶ 124, 129, 135, 139.) The Nekrilovs assert that those two purchased properties, if leased out long-term, would earn $3,800 and $1,800 monthly. (*Id.* ¶¶ 130, 140.) The Nekrilovs also expended $60,000 and $40,000 to renovate the two purchased properties. (*Id.* ¶¶ 126, 136.)

Kwan Ho Tang and Jayu Jen leased two properties and purchased one, operating short-term rentals out of each. They spent $6,600 and $8,900 to

---

https://www.youtube.com/watch?v=1aql4y5mRf8&t=30357s. (Compl. ¶ 66.) That recording is incorporated by reference in the complaint and thus forms a part of the record I consider on this motion to dismiss. *In re Asbestos Products Liability Litig.*, 822 F.3d at 134 n.7.

furnish the two leased properties and approximately $40,000 to renovate and furnish the purchased property. (*Id.* ¶¶ 190, 196, 211–12.) The long-term leases, combined, cost $5,700 per month at market-rate rents, and earned $9,000 a month in short-term rental income. (*Id.* ¶¶ 189, 190, 195, 197.) The purchased property has a mortgage of $3,300, earned $4,500 a month in short-term income, and, according to Tang and Jen, would earn $2,600 a month as a long-term rental. (*Id.* ¶¶ 208, 215–16.)

Alan Suen purchased two properties out of which he operated short-term rentals. One property has a monthly mortgage payment of $2,500 and the other has a mortgage of $3,500. (*Id.* ¶¶ 254, 258.) Suen and his mother made $383,000 in renovations to the properties, for which they used merchant cash advances and lines of credit, as well as credit card debt. (*Id.* ¶ 263.) They also spent $40,000 to furnish the properties, again financed with loans and credit cards. (*Id.* ¶ 264.) They have also incurred other costs over the course of renovating the properties in the range of approximately $130,000. (*Id.* ¶ 270.) The renovations were financed at high interest rates, and the monthly debt payments total approximately $35,000. (*Id.* ¶ 277.) Suen and his mother earned approximately $30,000 a month in income in 2019 and claim they will be profitable in the near future. (*Id.* ¶¶ 275, 278.)

A listing of the leases and properties of each plaintiff, and other allegations of the Complaint concerning their profitability, are reduced to a table in Appendix A to this Opinion.

### D. Procedural History

Plaintiffs brought this action on December 31, 2019, seeking various forms of relief, including a declaratory judgment that Ordinance 19-077 is unconstitutional, an injunction against the enforcement of the ordinance, compensatory damages, punitive damages, and attorneys' fees and costs. (Compl. Wherefore Clause.) They allege claims under various provisions of the United States Constitution, including the Takings Clause, the Contract Clause, and the Due Process Clauses of the Fifth and Fourteenth Amendments. (*Id.*

8

Counts One through Four.) Plaintiffs have moved for temporary and preliminary injunctive relief. Defendant Jersey City has filed a motion to dismiss and opposed the motion for injunctive relief. (DE 6.)

## II.   Discussion

### a.  Standards of Review

#### i.  Rule 12(b)(6) motion

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570; *see also West Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013).

That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters*, 760 F.3d at 302.

### ii.  Preliminary Injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The decision to grant or deny a preliminary injunction is within the Court's discretion. *See Am. Express Travel Related Servs., Inc. v. Sidamon—Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994).

In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

### b.  Takings Clause

The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use,

without just compensation." U.S. Const. amend. V.[5] Under that provision, I am tasked with a two-step process: First, I must find that the plaintiffs have asserted a "legally cognizable property interest." *Park Restoration, LLC v. Erie Ins. Exch.*, 855 F.3d 519, 526 (3d Cir. 2017) (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428–29 (3d Cir. 2004)). Second, I evaluate the plaintiff's claim that their property was taken from them, asking: "(1) was there a taking?; (2) was that taking for public use?; (3) did the claimant receive just compensation?" *Id.* at 525. Though "[t]he paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property," government regulation "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005).

No physical invasion has taken place here; the claim is clearly one of a regulatory taking. For a regulatory taking, there are two distinct tests. The first is the so-called "per se" taking identified in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992), pursuant to which "a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause" unless the challenged limitations "inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017); *see also Lucas,* 505 U.S. at 1015, 1029. This is a difficult test to satisfy: the court must find that the regulation forces the plaintiffs to "leave [their] property economically idle." 505 U.S. at 1019.

The second regulatory taking test is a more fluid evaluation known as the *Penn Central* test, which evaluates the alleged taking based on "a complex of

---

[5]     The Takings Clause applies to state and local governments through the Fourteenth Amendment. *Chicago, B & Q R., Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).

factors," including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 137 S. Ct. at 1937 (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)); *see Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

### i.    Legally Cognizable Property Interests

Before considering the two takings tests, however, I briefly discuss the property rights asserted by the Plaintiffs. Most of them are uncontroversial, including the right to use and enjoyment of their properties held in fee simple interest, the right to use and enjoyment of long-term leases, and the contractual interest in short-term rental bookings which would abrogated by Ordinance 19-077. *See ACRA Turf Club, LLC v. Zanzuccki*, 2012 WL 2864402, 2012 U.S. Dist. LEXIS 96017 at *29–30 (D.N.J. July 11, 2012); *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.").

Plaintiffs also claim, however, that they have a property interest consisting of their forward-looking right to "pursue their short-term rental businesses in Jersey City." (DE 1-6 at 16; DE 10 at 10.) I disagree. As the Supreme Court held in *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, while "[t]he assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment . . . . business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense." 527 U.S. 666, 675 (1999); *see also Antietam Battlefield KOA v. Hogan*, 2020 WL 6777590, 2020 U.S. Dist. LEXIS 215250 at *14–15 (D. Md. Nov. 18, 2020) (inability to conduct business is not a taking); *AJE Enter. LLC v. Justice*, 2020 WL 6940381, 2020 U.S. Dist. LEXIS 222186 at *20 (N.D. W. Va. Oct. 27, 2020); *Savage v. Mills*, 478 F. Supp. 3d 16, 31 (D. Me. Aug. 7, 2020) ("To state a taking claim, it is not enough to

allege that government conduct frustrated a business enterprise . . . . Takings jurisprudence is directed at government conduct that denies beneficial use of *property*, meaning things like legal interests in real or personal property, not the liberty interest to engage in business activity."); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 541 (E.D. N.C. 2020) ("the assertion of a 'general right to do business' has not been recognized as a constitutionally protected right"); *Tuchman v. Connecticut*, 185 F. Supp. 2d 169, 174–75 (D. Conn. 2002) (ability to engage in a business is not a federally protected property interest).

Plaintiffs cite *Longo v. Reilly*, 35 N.J. Super. 405, 411–12 (App. Div. 1955) and *Di Cristofaro v. Lauren Grove Memorial Park*, 43 N.J. Super. 244, 252–53 (App. Div. 1957) for the propositions that New Jersey courts recognize the "right to pursue one's business, calling, or occupation free from undue interference or molestation," *Di Cristofaro*, 43 N.J. Super. at 253, and that violation of that right is an "actionable infringement of a property right," *Louis Kamm v. Flink*, 113 N.J.L. 582 (N.J. E & A 1934). Those cases were decided in the context of tort law, however, not in the context of the Takings Clause. *Di Cristofaro*, 43 N.J. Super. at 252–53. Not everything recognized as "property" under state law is protected by the Takings Clause. While compensable property interests are often created by state law, *see Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998), "whether a particular state-created interest rises to the level of a 'legitimate claim of entitlement' is a question of federal law," *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)). Recognizing such a sweeping right would unreasonably broaden the scope of the Takings Clause so that it applied to any instance of business regulation, which the courts have steadfastly refused to do. *See In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 283 (4th Cir. 2007) ("The recognition of such a broad 'right to do business' would be akin to that recognized in *Lochner v. New York*, 198

13

U.S. 45 (1905) and its progeny, which the Supreme Court has long since refused to recognize.").[6]

I thus find that although the traditional rights associated with real estate which plaintiffs assert, enumerated above, are cognizable under the Takings Clause, their ongoing right to pursue a short-term rental business is not.

### ii.    Per se Taking

Plaintiffs assert that Jersey City engaged in a regulatory taking under both tests: (a) by denying all economically beneficial use of their property under the *Lucas* test and (b) by causing a partial taking of their property under the *Penn Central* test. In this subsection, I analyze the claim under the "economically beneficial use" test set forth in *Lucas*, 505 U.S. at 1019.

"[A] regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause." *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 124 (3d Cir. 2018) (quoting *Murr*, 137 S. Ct. at 1942)). Such "total taking[s]" occur where a regulation "declares 'off-limits' all economically productive or beneficial uses" of property. *Id.* (quoting *Lucas*, 505 U.S. at 1030).

Plaintiffs have not lost all economically beneficial use of their property. First, plaintiffs assert that their short-term rental businesses "will be totally lost as a result of Ord. 19-077" and that they have therefore lost all economically beneficial use of their specific property right in the operation of a business. (DE 10 at 11.) As stated in Section II.b.i, *supra*, however, plaintiffs have no protected property right in the ongoing operation of their businesses *per se*. Loss of the practical ability to carry on the business of short-term rentals at a profit is not in itself a taking.

---

[6] Plaintiffs also assert that *Department of Homeland Security v. Regency of the University of California*, 140 S. Ct. 1891 (2020) established that the government must take into account "legitimate reliance" interests and "expectation interests" on behalf of regulated individuals. (DE 12.) *Regents* concerned the application of the Administrative Procedures Act's "arbitrary and capricious" standard and has no applicability to Takings cases. *See* 140 S. Ct. at 1905, 1913.

Plaintiffs also assert that the short-term rental bookings they had entered into before the Ordinance was passed were abrogated. Ordinance 19-077, however, provides for a transition period. It exempts bookings entered into before June 25, 2019 (the effective date of the Ordinance) if they were scheduled for a date prior to January 1, 2021, which was then some eighteen months in the future. Jersey City Ord. 19-077. Plaintiffs admit that the vast majority of their "lost" rental bookings fall within that category (*see* DE 10 at 23–24), and hence were not lost at all.

In their opposition to the motion to dismiss, plaintiffs assert that between 10 to 20 bookings per plaintiff did not fall within that transitional exemption. (*Id.*) Ordinance 19-077, however, is not a total ban. It permits up to 60 nights per year of short-term rentals at non-owner-occupied properties. Jersey City Ord. 19-077. Plaintiffs offer no allegations to support the conclusion that their 10–20 bookings total more than 60 total nights in a year. Thus, I cannot conclude that any of these bookings were abrogated by the Ordinance.

I turn to the plaintiffs' properties which are not owned, but held under long-term leases. Plaintiffs do not specifically plead how long the terms on these leases are, except where they note that most will end in 2020 and 2021. (*See, e.g.*, Compl ¶¶ 111–15, 146, 149, 191, 197.) Nothing in Ordinance 19-077 causes a total loss of plaintiffs' long-term leases. The long-term leases themselves are not abrogated by the 2019 ordinance. Nor is their economic value destroyed. Plaintiffs still have use of the leased properties. For example, they may occupy the properties for their own purposes; if not, they may use them for businesses other than short-term leasing; if not, they may sublease the properties to others. That is a viable, residual economic use of the properties. *See Greenblatt v. Klein*, 2015 U.S. Dist. LEXIS 28769 at *16 (D.N.J. Mar. 9, 2015) (the "alleged regulatory taking has not denied [plaintiffs] all economically beneficial uses of their property—there is no reason why Plaintiffs could not continue to use or rent it"). Such options might not be as profitable as short-term rentals, but the property is clearly not rendered "economically

15

idle." *Lucas*, 505 U.S. at 1019; *see also Iron Bar, LLC v. Dougherty*, 2021 WL 363706, 2021 U.S. Dist. LEXIS 20416 at \*17 (D.N.J. Feb. 3, 2021) (revocation of liquor license was not a *Lucas* taking where the building could be set to other uses).[7]

More broadly, the plaintiffs have not been deprived of all economically beneficial use of their real estate property. Those properties retain numerous economic uses: the plaintiffs can sell them, rent them as long-term leases, or use them as homes.

Plaintiffs assert, however, that they have nevertheless been deprived of the *profitable* use of their properties. (DE 10 at 12.) That claim might be viewed in two ways: first, that there has been a total taking of the expected profits from short-term rentals, and second, that the property has no economically viable use apart from such short-term rental profits.

Some cases have recognized a limited expectation interest in profits and acknowledge that the deprivation of such interests can be a taking. *Williamson County Reg'l Planning Comm'n v Hamilton Bank*, 473 U.S. 172, 191 n.12 (1985) (property owner sought compensation for its expectation interest where it built a golf course and installed water and sewer connections for large development, but was then constrained by zoning changes to a small development which would not support the initial expenditures). Here, however, such an interest is, at best, just one of the bundle of property rights that the plaintiffs hold in their long-term leases and fee simple holdings. *Andrus v. Allard*, 444 U.S. 51, 65–66 (1979) (no taking where government seizes only one "strand" in the bundle of property rights; prohibition on business of selling artifacts not a total taking where owners "retain the rights to possess and transport their property, and to donate or devise" it); *see also Penn Cent.*, 438 U.S. at 130–31 ("'Taking'

---

[7] The Nekrilovs complain that their landlords have refused or may refuse to renew their long-term leases. (DE 16 at 2) Such refusals do not disturb a vested right and would not deprive them of an identified property interest. *See Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 161 (1980) ("a mere unilateral expectation or an abstract need is not a property interest entitled to protection"). Non-renewal would also, of course, relieve them of the expense of paying rent.

jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated . . . . [t]his Court focuses rather both on the character of the action and the nature and extent of the interference with rights in the parcel as a whole . . . ."); *see also Crow-New Jersey 23 Ltd. P'Ship v. Clinton*, 718 F. Supp. 378, 383–84 (D.N.J. 1989) (though "the loss of an expectation interest may be a predicate for a takings claim," such a claim is alone insufficient to establish that the plaintiffs have been "deprived . . . of economically viable use" and thus constitutes "mere diminution in the value of land . . . [which] does not constitute a taking."). This argument may, however, be more relevant within the *Penn Central* framework. *See* Section II.b.iii, *infra*.

The second part of plaintiffs' claim trades on the interpretation of the phrase "economically viable use." The argument would be that a property is not "economically viable" unless plaintiffs can make a profit on it; a losing investment, they say, is not an "economically viable" one. (DE 1-6 at 24 (claiming no "'reasonable economic' use" for properties because they cannot receive a "reasonable return on their investments"); DE 10 at 11.) This approach, however, finds little support in *Lucas*, which explains that an "economically viable use" exists unless a property is rendered "economically idle." 505 U.S. 1019; *see also Park Ave. Tower Assocs. v. New York*, 746 F.2d 135, 139 (2d Cir. 1984) ("The crucial inquiry . . . is not whether the regulation permits plaintiffs to use the property in a 'profitable' manner, but whether the property use allowed by the regulation is sufficiently desirable to permit property owners to 'sell the property to someone for that use.'") (quoting *Sadowsky v. New York*, 732 F.2d 312, 318 (2d Cir. 1984)); *Greystone Hotel Co. v. City of New York*, 13 F. Supp. 2d 524, 528 (S.D.N.Y. 1998) ("lack of a profit does not establish a regulatory taking").

> The vast majority of takings jurisprudence examines . . . not lost profits but the lost value of the taken property . . . . When the Supreme Court has assessed the economic impact of a regulatory taking, it has talked almost exclusively in terms of lost value rather than lost profits . . . . Additionally, other federal circuits and the

17

state courts often take this approach . . . . Thus, when a court considers only a profits-based approach, this precedent provides limited guidance and constrains a factfinder's ability to provide a complete and fair assessment of the economic impact" of a regulation.

*Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1268–69 (Fed. Cir. 2009) Again, however, this argument may have more traction within the *Penn Central* framework.

There are plainly other economic uses to which plaintiffs can put their property. They have not adequately pled a *Lucas per se* taking claim.

### iii.   *Penn Central* Factors

Absent a *per se* taking, plaintiffs may attempt to show that their property was taken under the more fluid factors set out in *Penn Central*. Those factors are

(1) the economic impact of the regulation on the claimant;
(2) the extent to which the regulation has interfered with distinct investment-backed expectations; and
(3) the character of the governmental action.

*Murr*, 137 S. Ct. at 1943; *Penn Central*, 438 U.S. at 124.

The function of the *Penn Central* test is to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights . . . . the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 539–40.

The government's regulatory authority is broad, and the availability of relief under *Penn Central* is correspondingly narrow. "'[A] regulatory limitation on the right to use and receive profits from property will not necessarily or even usually establish that there has been a taking.'" *Pinewood Estates of Michigan*

*v. Barnegat Township Leveling Bd.*, 898 F.2d 347, 351 (3d Cir. 1990) (quoting
*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982)).
"[T]he submission that appellants may establish a 'taking' simply by showing
that they have been denied the ability to exploit a property interest that they
heretofore had believed was available for development is quite simply
untenable." *Penn Central*, 438 U.S. at 130. Thus, courts tend to reject takings
claims where a law imposes restrictions "substantially related to the promotion
of the general welfare" and which, while ruling out some uses, nevertheless
"permit reasonable beneficial use." *Rogin v. Bensalem Township*, 616 F.2d 680,
691 (3d Cir. 1980). In particular, states are afforded "broad power to regulate
housing conditions in general and the landlord-tenant relationship in
particular without paying compensation for all economic injuries that such
regulation entails." *Yee v. City of Escondido*, 503 U.S. 519, 528–29 (1992).

    1. <u>The Economic Impact of the Regulation on the Plaintiffs</u>

    There is no question that Ordinance 19-077 adversely impacts the
plaintiffs by denying them profits, or even profitability, from the short-term
rental business. Nevertheless, a regulation which merely "adversely affect[s]
economic values" is not sufficient to constitute a taking. *New Jersey v. United
States*, 91 F.3d 463, 468 (3d Cir. 1996). "'[E]ven a substantial reduction of the
attractiveness of the property to potential purchasers' generally does 'not
entitle an owner to compensation under the Fifth Amendment.'" *Woodbridge
Ctr. Realty, L.P. v. Twp. Council*, 2016 WL 1243952, 2016 U.S. Dist. LEXIS
41874 at *9 (D.N.J. Mar. 30, 2016). Thus, in *Rogin v. Bensalem*, the Third
Circuit considered a property in Bensalem Township which the plaintiff
purchased for $3 million. 616 F.2d at 692. Bensalem then implemented a new
amendment to the zoning law which reduced the value of the property to $2
million. *Id.* The Third Circuit found that a one-million dollar loss did not weigh
in favor of finding a taking, reasoning that the economic impact was not
sufficiently "drastic[]." *Id. Rogin* relied on decisions by the United States
Supreme Court which found no taking where a challenged law had reduced the

value of land by as much as seventy-five or eighty-seven percent. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (75% diminution); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87.5% diminution). Similarly, in *Penn Central* itself, Penn Central had entered into a 50-year lease by which it would permit a United Kingdom corporation to build a multistory office building above Penn Station Terminal, 438 U.S. at 116. Penn Central stood to earn $1 million annually during construction of the building and at least $3 million annually thereafter. *Id.* The City of New York, however, designated Penn Station Terminal as a historic landmark, depriving Penn Central of that revenue stream. *Id.* at 115–16.

Plaintiffs have not alleged the precise amount of diminution of value of their property. It appears that their purchased properties and long-term leases, if rented out under long-term leases or subleases, might earn between one-half and one-third of what they could have earned as short-term rentals. (*See* Appendix A.) Thus, even if the properties' value derived solely from their ability to earn income as short-term rentals, I could conclude that the properties have lost between 50% and 66% of their value. Even that estimated diminution in value, however, does not qualify as a "drastic" reduction under the Third Circuit and Supreme Court precedents.[8]

I thus find that this factor weighs against finding a taking.

Plaintiffs suggest an alternative measure of evaluating their loss. The practical impact of Ordinance 19-077, they say, has been to eliminate their

---

[8] Nor, critically, does it equate to an equivalent drop in the value of the property. A theoretical willing purchaser would pay a price reflecting its suitability for purposes other than Airbnb-style rentals. Indeed, a purchaser who intended to own and occupy the property might pay a premium; the 2019 Ordinance exempts owner-occupiers from its most stringent restrictions. Thus the properties may be worth more in other hands than they are in the hands of plaintiffs.

More generally, of course, the value of a property in Jersey City depends on a variety of factors, such as desirable location, convenient commuting, and scarcity of other nearby housing opportunities.

ability to turn a profit on their properties and long-term leases, thus denying them a "reasonable return on their investments." (DE 1-6 at 24; DE 10 at 11.)

The typical method a court uses in evaluating the impact of a taking is diminution in property value, not profits, although the two are surely not unrelated. *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 n.3 (3d Cir. 1990) ("just compensation is measured by the difference between the market value of the entire holding immediately before the taking and the remaining market value immediately thereafter of the portion of property rights not taken."); *Rose Acre Farms*, 559 F.3d at 1268–69. The Third Circuit has, however, occasionally relied on profitable uses of the property in determining the economic impact of a regulation. *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1031 (3d Cir. 1987) (rezoning reduced value of acreage from $495,600 to $52,000, but no taking found); *but see id.* at 1031 & n.4 (Pace "has not been deprived of *all* economically viable uses of this property" because "[t]he rezoned value of $1,400 per acre compares favorably with Pace's original $515.07 per acre investment."). Similarly, *Penn Central* itself favorably noted that the landmark restriction in that case would "permit[] Penn Central not only to profit from the Terminal but also to obtain a 'reasonable return' on its investment." 438 U.S. at 136; *see also Vasquez v. Foxx*, 895 F.3d 515, 525 (7th Cir. 2018).

Nevertheless, the profit measure of economic impact is a disfavored basis for finding a taking. In *Andrus v. Allard,* the Supreme Court explained:

> [L]oss of future profits – unaccompanied by any physical property restriction – provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.

444 U.S. at 66; *see also Phillips v. Wash. Legal Found.*, 524 U.S. 156, 168 (1998) (same); *Help Hoboken Housing v. Hoboken*, 650 F. Supp. 793, 798

(D.N.J. 1986) (same). Claims based on expectation interests are "fraught with the difficulty of determining whether the reduced expectation rises to the level of a taking." *Crow-New Jersey 23*, 718 F. Supp. at 383. Thus, plaintiffs face the challenge of establishing that the reduction to their expectation interest is not "completely speculative." *Help Hoboken*, 650 F. Supp. at 798.

I find plaintiffs' projected lost profits, whatever their significance, to be relatively speculative. It is not clear what plaintiffs' profits would have been: Suen, for instance, has not yet turned a profit on his investments and it is unclear whether he ever will. The Nekrilovs, Tang, and Jen, who have earned profits on their investments, cannot be certain that such profits would continue into the future. Even if Ordinance 19-077 had never gone into effect, the profitability of their busines would depend on factors such as the entrance of other short-term rental operators into the market, reviews by tenants who rented their properties, whether Jersey City increased its property taxes, whether Airbnb demanded a greater share of their earnings per booking, or whether Jersey City retains its reputation as a trendy location near New York City. As this past year has demonstrated, completely unexpected occurrences can have unpredictable impacts on the profitability of rental properties. Plaintiffs acknowledge as much in their recent update letter. (DE 16 at 1 ("while, from March through May, the demand for short-term rentals dropped significantly due to the COVID-19 crises, demand actually bounced back from then going forward (and is currently very close to the level that existed prior to the COVID-19 crisis)")). These contingencies demonstrate the speculative nature of any expectation interest the plaintiffs could assert. In short, it is unrealistic to treat the 2019 Ordinance as if it were the only thing standing between the plaintiffs and guaranteed profitability.

Nor is it clear that the plaintiffs will *not* be able to earn a profit from selling the properties they own. Plaintiffs improved their properties via renovations. Jersey City, a short commute from New York City, has a notoriously tight housing market, to the point that it apparently has not been harmed by the coronavirus pandemic. (*Id.*) There will certainly be parties

interested in purchasing plaintiffs' property, but plaintiffs fail to allege—or bring forth any facts—supporting the proposition that they could not sell the property to those parties for a profit or at least largely breaking even. Plaintiffs sidestep the issue by asserting that selling the property is not an "economic use." (DE 1-6 at 21 n.10 (citing *Lost Tree Village Corp. v. U.S.*, 787 F.3d 1111, 1117 (Fed. Cir. 2015).) In that case, however, the Federal Circuit only concluded that sale of land is not an economic use where land has "no underlying economic uses." 787 F.3d at 1117 (explaining that not "all sales qualify as economic uses."). Here, however, plaintiffs retain numerous economic uses of their property, including renting it out as a long-term lease, renting it as a short-term rental for 60 days a year, or occupying it. And the value of the property to a willing buyer—even if only a theoretical one—remains the ultimate measure of the property's value.

Finally, focusing on the properties held under long-term leases, it is far from clear, based on the allegations in the Complaint, that the plaintiffs will lose money. They acknowledge that the leases were rented at market-rate prices. If they are trapped in a long-term lease, they could presumably sublet the premises at similar prices. The allegations do not suffice to support an inference that any loss will be "drastic."

I take into account the likelihood that Ordinance 19-077 will deny revenues that plaintiffs hoped to reap from the short-term rental business. Their allegations do not, however, take into account alternative means of exploiting the properties, such as sale of the owned properties, subleases of the lease properties, and alternative business or personal uses of the properties. A Takings claim requires more than an allegation that the plaintiff has carried on a particular kind of business at the property and can no longer do so, or can no longer do so at a profit. The plaintiffs have not alleged sufficient facts to show a diminution in their property values sufficient to weigh in favor of a finding of a taking.

    2.  <u>The Extent to Which Ordinance 19-077 Has Interfered With Plaintiffs' Distinct Investment-Backed Expectations</u>

Next, I consider the overlapping factor of plaintiffs' reasonable, investment-backed expectations in connection with the properties.[9] Though this factor presents a closer question, I also conclude it does not weigh in favor of finding a taking. Jersey City's regulation of short-term rentals has indeed been inconsistent. I cannot conclude, however, that the plaintiffs have some entitlement to operate short-term rentals with minimal regulation merely because the City permitted it previously.

Laws change, and there is no general right to governmental consistency over time. "[D]istinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Id.* at 1033. Also relevant to the determination of reasonable investment-backed expectations are "the law in force in the State in which the property is located," *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (citing *Lucas*, 505 U.S. at 1027–29)), as well as whether the government invited the activity with promises that certain property rights would be protected, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1010–1013 (1984) (taking where statute explicitly assured that trade secrets submitted to EPA would be kept confidential but subsequent enactment would remove confidentiality). Nevertheless, "[t]he general expectation of regulatory change is no less present where the value of the property interest is derived from the regulation itself." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146 (3d Cir. 2018).

Plaintiffs assert that Ordinance 15.137 gave them reasonable investment-backed expectations that short-term, Airbnb-style rentals would be allowed in Jersey City. (DE 10 at 13, 15.) As previously mentioned, that Ordinance permitted short-term rentals "as an accessory use to a permitted principal residential use in all zoning districts and redevelopment plan areas

---

[9] Plaintiffs assert that this factor "takes precedence" in the *Penn Central* analysis (DE 1-6 at 18), but "[i]nvestment-backed expectations, though important, are not talismanic under *Penn Central*." *Palazzolo*, 533 U.S. at 634. They are but "one factor that points toward the answer to the question whether the application of a particular regulation to particular property 'goes too far.'" *Id.*

24

where residential uses are permitted," required a license for the use of more than five separate dwelling units, and directed that said rentals be "conducted in a manner that does not materially disrupt the residential character of the neighborhood." Jersey City Ord. 15.137.

Plaintiffs also assert they had reasonable investment-backed expectations of continuing their short-term rental operations because Jersey City officials made numerous statements explaining that they intended to work with, rather than against, home rental platforms such as Airbnb. (DE 10 at 15; Compl. ¶¶ 41.) Specifically, Mayor Fulop stated that Airbnb was the "future" of Jersey City's economy and that, unlike other municipalities, Jersey City would "make change our friend." (*Id.* ¶ 42); Steven Fulop, *Why Jersey City Will Allow Airbnb.*

City officials also, however, offered some qualifying statements. In a press release accompanying the proposal of Ordinance 15.137, the City stated that the ordinance "includes several commonsense protections. It would prohibit homeowners and renters from 'changing the character of the neighborhood.' It would also limit the number of properties one user could rent on the platform to five, so as to prevent the formation of informal 'Airbnb hotels.'" (Compl. Exh. 3.) Mayor Fulop described the purpose of the ordinance as allowing "middle-class folks [to] earn a bit of extra income by renting out their apartments," and explained that "people can't rent out so many rooms as to create an informal hotel; they can't change the nature of the neighborhood." Steven Fulop, *Why Jersey City Will Allow Airbnb.*

This factor also overlaps with the prior analysis of the properties' residual value, assuming short-term rentals are not allowed. Just because "a property has been devoted to a particular use" does not mean "the owner has a reasonable expectation of being able to continue with *that* use absent the payment of compensation." *Pace*, 808 F.2d at 1032 (emphasis added). If the property retains value, then no expectation has been defeated by a regulation that prohibits a *particular* kind of business being carried on there. A court may

assist a person denied the opportunity to clean floors, but not if he won't do windows.

I weigh this factor as leaning against, but not strongly against, the plaintiffs. The allegations of the Complaint do not establish that plaintiffs had reasonable-investment-backed expectations in continuing to operate their short-term rentals, because they do not take into account the power of the state to regulate in the public interest. *Pace*, 808 F.2d at 1033. Plaintiffs' expectations regarding short-term rentals were always necessarily subject to the possibility that the City would regulate those rentals in the future.

Plaintiffs rely on *Monsanto v. Ruckelshaus*[10] for the proposition that reliance on government actions can give rise to a reasonable investment backed expectation. (DE 1-6 at 19; DE 10 at 14 n.6.) *Ruckelshaus*, however, only highlights what is missing from plaintiffs' allegations. In *Ruckelshaus*, a regulated company submitted trade secrets to the EPA based "explicit assurances" in the statute that they would be kept confidential. 467 U.S. at 1011. As the Court pointed out, the central value of a trade secret is the right to exclude others. The government, however, disclosed and used the information, thereby destroying its value.

No "explicit assurances" akin to those in *Ruckelshaus* were made here; plaintiffs do not identify any provision in Ordinance 15.137 or statement by Jersey City officials which offered assurances that short-term rentals would not be further regulated by the City.[11] Indeed, to the extent Jersey City permitted short-term rentals, it did so with significant qualifications. For example, short-

---

[10]    They also rely on *Washington Market Enterprises, Inc. v. City of Trenton*, a wholly inapplicable case involving a plaintiff who sought compensation after his property was declared blighted by the city as a step towards an urban renewal project. 68 N.J. 107, 119 (N.J. 1975).

[11] Plaintiffs cite a number of quotations from news articles which appear to contrast Jersey City's Ordinance 15.137 with New York's rules, which do not permit short-term rentals on properties which are not owner-occupied. (DE 10 at 19.) Plaintiffs are unable, however, to attribute those quotes to any Jersey City official or press release. They claim, invalidly in my view, that Jersey City must be presumed to have approved the contents of any article in which a Jersey City official was quoted. (*Id.* at 19 n.8.)

term rentals would not be permitted to change the character of neighborhoods or operate as informal hotels. Licenses for the maintenance of more than five separate dwelling units as short-term rentals would be required, indicating that large-scale operations would be subject to more onerous oversight. Indeed, Mayor Fulop explained that the point of the ordinance was to permit individuals to make extra income by renting out their apartments; he did not state that the ordinance permitted large-scale short-term rental investments or significant business operations.

To be sure, the plaintiffs' reliance on Ordinance 15.137 is understandable, and the City did impose onerous regulations on businesses that it had welcomed just four years earlier. "[T]hose who do business in [a] regulated field," however, "cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227 (1986). In short, the municipality may, for the general welfare, adjust and revise its prior regulations in light of experience. Jersey City made clear in Ordinance 15.137 that short-term rentals would be tolerated to the extent they did not change neighborhood character or constitute informal hotels; Ordinance 19-077 puts teeth in those general statements of purpose in a way that is consistent with the City's statements of purpose.

Mayor Fulop's statements that home-rental platforms were the "future" and that the City would be a "friend" to change were not specific enough to give rise to a reasonable expectation that Ordinance 15-137 would not be revised. They do not constitute "explicit assurances" that short-term rentals would always be permitted in the City, on the same terms, into the indefinite future.

For completeness, I round out the discussion with some arguments by the City which I found less convincing. They are set out in the margin.[12]

---

[12] The City argues that the Nekrilovs lacked any reasonable expectation because they never applied for a license with the City as required under Ordinance 15.137. *See* Ord. § 15.137 (requiring license issued pursuant to Ordinance 254-82); Ord. § 254-83 (application need only state name and address of manager, location of establishment,

All in all, while plaintiff makes significant points here, on balance I find for the City on this factor.

### 3. The Character of the Governmental Action

"A taking may be more readily found when the interference with property can be characterized as a physical invasion by government . . . than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S.

---

number of units occupied, and must contain required fee); Ord. § 254-86 (license contingent upon inspection of building); *id.* § 254-87 (license may be denied to individuals who are unfit by reason of criminal convictions or mental or physical unfitness). The City does not assert that this violation would have justified a forfeiture; indeed, the City does not even assert that the Nekrilovs' application would have been denied. It is not enough to identify a violation, unless it was disqualifying in some way. *Compare Midnight Sessions, Ltd. v. Philadelphia*, 945 F.3d 667, 678 (3d Cir. 1991) (where code violations prevented dance hall from receiving certificate of occupancy, no taking resulted from denial of license).

I also reject the City's arguments based on a proposed Ordinance, No. 19-045. Ordinance 19-045, introduced on April 24, 2019, was never enacted, but rather was tabled on a motion by members of the Jersey City Council. (DE 6-3 at 44 (Exh. C).) It would have imposed many of the same restrictions as Ordinance 19-077, which was passed some months later, on June 25, 2019. (DE 11 at 4.) Tang and Jen purchased their property in the interim, after Ordinance 19-045 was introduced but before Ordinance 19-077 was enacted. (They entered into their long-term leases, however, before Ordinance 19-045 was ever proposed. (Compl. ¶¶ 189, 194).) The City claims that Ordinance 19-045, though not passed, should have placed Plaintiffs on notice that regulatory changes were in the offing. I am unconvinced. While plaintiffs are charged with knowledge of the law, they are not required to take into account laws that were never enacted. Indeed, it is easy to argue the contrary, *i.e.,* that an investor might have been encouraged by the tabling of Ordinance 19-045.

Finally, I am not convinced by Jersey City's argument that Ordinance 15.137 should have put plaintiffs on notice that their businesses were contrary to the purpose of the ordinance because it solely permitted short-term rentals as "an accessory use" to principal residential uses. This is misleading. An "accessory use" is a use of a property "implied as a matter of law as a right which accompanies the principal use." *Shim v. Washington Twp. Planning Bd.*, 298 N.J. Super. 395, 401 (App. Div. 1997); *see also Zahn v. Board of Adj.*, 45 N.J. Super. 516, 521–22 (App. Div. 1957) (allowance of a primary use "generally authorizes all uses normally accessory, auxiliary or incidental thereto."). Thus, when Ordinance 15.137 permitted short-term rentals as an accessory use to principal residential uses, it was not permitting short-term rentals as "accessory uses" in the colloquial sense of person a partial or occasional use of the property, but rather it defined short-term rentals as being a method of use of the property which was permitted as a right accompanying any right to use a property for residential purposes.

at 124; *Midnight Sessions*, 945 F.2d at 676. Thus, "in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." *Penn Central*, 438 U.S. at 125. In the uncommon cases where such regulations have been disallowed, a key consideration has been that they appeared to shift burdens between private parties *without* any obvious connection to public interests. *Compare Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) (taking where the government passed law prohibiting mining coal so as to cause subsidence to surface owners because the purpose of the law was solely to benefit the surface owners at the cost of the mining companies), *with Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 716 (3d Cir. 1985) (distinguishing *Mahon* on nearly identical facts because the law in *Keystone* had the public purpose of shoring up municipal tax bases and preserving land). Finally, "if the law at issue 'applies generally to a broad class of properties,' a court is likely to find that no taking has occurred." *Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342, 349 (M.D. Pa. 2016) (quoting *Rogin*, 616 F.2d at 690).

Ordinance 19-077 is a generally applicable public program seeking to adjust the benefits and burdens of economic life in order to promote the common good. It is aimed at increasing the long-term housing stock in Jersey City and reducing nuisances. I find this factor cuts in favor of a finding that no taking has occurred.

Plaintiffs make two arguments to the contrary.

First, they accuse Mayor Fulop of enacting Ordinance 19-077 for the improper purpose of punishing Airbnb for being insufficiently forthcoming with campaign donations. (DE 1-6 at 26; *see also* DE 10 at 24.) Takings law, of course, must be understood in the context of our political system, which, for better or worse, runs on campaign donations. *See, e.g., McCormick v. United States*, 500 U.S. 257, 272 (1991) (rejecting claim of extortion where legislators

29

"act for the benefit of constituents or support legislation furthering the interest of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries," reasoning that such conduct has not only "long been thought to be well within the law" but "also conduct that in a very real sense is unavoidable so long as campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."). Indeed, as Justice Kennedy has opined,

> Favoritism and influence are not . . . avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness.

*Citizens United v. FEC*, 558 U.S. 310, 359 (2010) (quoting *McConnell v. FEC*, 540 U.S. 93, 297 (2003)).[13] Plaintiffs' evidence, moreover, falls short of persuasive proof of any corrupt quid pro quo, or, to be more precise, withdrawal of a quid for lack of a quo. They note that Mayor Fulop called Airbnb to complain that he had not received any donations, and tie that by innuendo to the Mayor's decision to enact the 2019 ordinance. But this narrative ignores key facts. To begin with, Airbnb sent the Mayor a significant if not munificent donation twelve days later. Even more significantly, the Ordinance was enacted, not by the Mayor himself, but by a "veto-proof" 7-2 vote of the Jersey City Council. (Compl. Exh. 1.) Plaintiffs attribute no untoward motives to those seven Council members.

---

[13] Those cases, of course, arose in different legal contexts. I cite them only for their observations about the role of campaign contributions. Individuals may give financial support to politicians who support their agendas and withhold it from those who support their rivals' agendas.

30

Plaintiffs' second argument is that Councilman James Solomon of the Jersey City Council admitted that his purpose in passing Ordinance 19-077 was to benefit trade unions at plaintiffs' expense. (DE 1-6 at 26; DE 10 at 24.) Councilman Solomon stated, among other things, that he was a strong supporter of trade unions. There is nothing wrong, of course, with a particular politician favoring trade unions over others—or, of course, the opposite. Councilman Solomon's statements, moreover, took the form of identifying classes of individual who, in his opinion, were being injured by the Airbnb's style of short-term leasing. He explained that he was in favor of the 2019 Ordinance because: (1) he doubted that Airbnb tourism was significantly benefitting Jersey City, when overnight tourists were far more likely to be visiting New York City; (2) he believed in attracting long-term rather than short-term residents, because long-term residents would be more motivated to contribute to the culture of the city and the improvement of the community; and (3) he thought Airbnb had a negative impact on housing supply and would increase long-term rental prices. Jersey City Special Council Meeting, Airbnb June 25, 2019, https://www.youtube.com/watch?v=1aql4y5mRf8&t=30357s at 8:20:00–8:27:10.[14] Those statements clearly express a legitimate public purpose unrelated to merely rewarding one private party at the expense of another. And in any event, Councilman Solomon's vote was but one of nine; he was explaining his individual vote, not speaking for the Council.

I therefore find that this third *Penn Central* factor, the nature of the government action, counsels strongly against finding a taking here.

Weighing the three factors of the *Penn Central* test, I conclude that the Complaint fails to allege a valid claim that Ordinance 19-077 effected an unconstitutional taking. I therefore **GRANT** the City's motion insofar as it seeks to dismiss the Takings claim.

---

[14]     As mentioned previously, this video was incorporated by reference in plaintiffs' complaint. *In re Asbestos Products Liability Litig.*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).

### c. Contracts Clause

Plaintiffs assert that Ordinance 19-077 violates the Contracts Clause of the U.S. Constitution because it impairs vested long-term leases and short-term rental bookings. (DE 1-6 at 27; DE 10 at 23–24.) Specifically, they claim the Ordinance abrogates the 14 short-term contracts for the Nekrilovs, 10 short-term contracts for Tang and Jen, and 20 short-term contracts for Suen. (DE 10 at 23.)[15] They also assert that Ordinance 19-077 will force the Nekrilovs, Tang and Jen to break their long-term leases, which will no longer be affordable unless they can sublease those properties as short-term leases on the Airbnb model. (*Id.* at 23–24.)

The Contracts Clause of Article I of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I § 10. The clause is not, however, as broad as it may seem. *ACRA Turf Club, LLC v. Zanzuccki*, 724 F. App'x 102, 107 (3d Cir. 2018). It does not prevent states from "exercising the police powers vested in them 'for the promotion of the common weal, or [that] are necessary for the general good of the public,' even though the contracts previously entered into are affected." *Id.* at 107. Put another way, citizens have no general power to privately agree to exempt themselves from governmental authority. Thus, to "harmoniz[e] the command of the Clause with the necessarily reserved sovereign power of the states to provide for the welfare of their citizens," *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016), courts apply the following three-part test to determine whether legislation violates the Contracts Clause:

---

[15]     As previously noted in Section II.b.ii, *supra*, plaintiffs originally sought compensation for all of their short-term rental bookings (DE 1-6 at 27), but withdrew that claim *except* as to short-term rental bookings they entered into after June 25, 2019. They acknowledge that Ordinance 19-077 exempted most bookings entered into before that date, (DE 10 at 23.)

> [1] [W]hether the law has operated as a substantial impairment of a contractual relationship; [2] whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and [3] whether the impairment is reasonable and necessary to serve this important public purposes.

*ACRA Turf Club*, 724 Fed. Appx. at 108. With respect to whether a law is reasonable and necessary, courts generally defer to legislative judgment. *Id.* (citing *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 412–13 (1983)).

"To determine whether legislation has substantially impaired contract rights, '[courts] ask whether legitimate expectations have been thwarted.'" *Id.* (quoting *United Steel*, 842 F.3d at 210). "After identifying a plaintiff's legitimate expectations, a court then determines 'whether the modification imposes an obligation or liability that was unexpected at the time the parties entered into the contract and relied on its terms.'" *ACRA Turf Club*, 2012 WL 2864402, 2012 U.S. Dist. LEXIS 96017 at *22; *see also U.S. Trust. Co. of New York v. New Jersey*, 431 U.S. 1, 19 (1977) (substantial impairment where repeal of security provision in contract exposed Port Authority's general reserve fund to depletion).

If I find substantial impairment, my inquiry then "'turns to the means and ends of the legislation'; namely, 'whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose . . . . such as the remedying of a broad and general social or economic problem.'" *ASAH v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1015 (D.N.J. 2018) (quoting *Energy Reserves Grp*, 459 U.S. at 411). Once such a legitimate public purpose has been identified, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.* at 1016 (quoting *Energy Reserves Grp.*, 459 U.S. at 412). Where the government is not a party to a contract,

33

courts "properly defer[] to legislative judgment as to the necessity and reasonableness of the act." *Keystone Bituminous Coal Ass'n*, 771 F.2d at 718.

I will dismiss plaintiffs' Contract Clause claims. Even assuming they have demonstrated substantial impairment of their contracts, plaintiffs have failed to show that Jersey City lacked a legitimate public purpose in enacting the Ordinance or that the Ordinance was not a reasonable adjustment of the rights and responsibilities of the contracting parties. As noted in Section II.b.iii, *supra*, I do not credit plaintiffs' allegations that Jersey City officials passed the Ordinance for the purpose of retribution against recalcitrant donors or solely to serve trade unions. Plaintiffs simply have not provided adequate support for that proposition. In contrast, the City's professed reasons for enacting the Ordinance, including increasing the availability of long-term housing for Jersey City residents and reducing nuisance violations, are entitled to deference and appear well supported. (Compl. Exh. 1 at 1–2.)

For instance, a legislator could reasonably believe that Airbnb reduces long-term housing supply and as a result increases long-term housing costs. The Nekrilovs held 17 leases which they made available solely for short-term rentals, (*See* Appendix A); those 17 properties by definition became unavailable for long-term residents of the City. The aggregate effect of numerous individuals going into the short-term rental business[16] could reasonably be expected to substantially impact the housing supply in the City. Basic supply-and-demand economic principles suggest that a reduction in supply, assuming stable demand, should increase prices, thereby increasing housing costs for Jersey City residents. An increase in the percentage of short-term rentals, driven by the higher rents in comparison to long-term rentals (*see* Appendix A), could be expected to exert upward pressure on rents generally, as landlords seek to maximize profits. *A fortiori,* a reasonable legislator could think so. The

---

[16]    Plaintiffs do not include any allegations regarding how many short-term rental operators there were in Jersey City at the time Ordinance 19-077 was adopted. They did mention in their brief in support of an order to show cause that they believe it is "potentially [in the] thousands." (DE 1-6 at 16 n.6.)

City, considering these possibilities, was well within its authority to opt to limit short-term rentals, thus prioritizing the wellbeing of its long-term residents over plaintiffs' business interests.

Furthermore, the City concluded that the presence of short-term rentals could create "nuisance violations, which include, but are not limited to, excessive noise, on-street parking, accumulation of trash, and diminished public safety," and thus, in addition to increasing long-term housing supply, the presence of short-term rentals reduced the quality of life of Jersey City residents. The City was thus permitted to conclude that Ordinance 19-077 was required to "minimize potential deleterious effects of short-term rental properties on other properties in the surrounding neighborhoods in which they are located." (Compl. Exh. 1 at 1–2.) The City was entitled to prioritize its residents' quality of life over the plaintiffs' business.

Last, I find that Jersey City's adjustment of the rights and responsibilities of the parties is of a character appropriate to the public purpose. Again, the City is entitled to deference in its decision, and in any event it appears Ordinance 19-077 was well-designed to serve the City's legitimate purpose. The provision limiting short-term rentals to owner-occupied residences serves the purposes of limiting the total number of short-term rentals. At the same time, owners are likely to be more discerning when deciding whether to permit a tenant to stay in their home as opposed to in a remote property, so the limitation should serve the Ordinance's goal of limiting nuisances, diminished public safety, and excessive noise. In light of the deference Jersey City is entitled to under the framework for evaluating Contract Clause violations, the City clearly acted permissibly here.

On this motion to dismiss, I have credited the plaintiffs' allegations, but considered them in the context of the Ordinance itself and the public purposes therefor. The motion to dismiss is **GRANTED** as to the plaintiffs' Contract Clause claim.

### d. Substantive Due Process Clause

Plaintiffs further claim Ordinance 19-077 violates the Substantive Due Process guarantees of the United States Constitution. (DE 22–24.) "When a party lodges a Due Process challenge to a legislative action, as here, the act is subject to rational-basis review and, to establish its legality, 'the defendant must demonstrate (1) the existence of a legitimate state interest that (2) could be rationally furthered by the statute.'" *ACRA Turf Club*, 724 Fed. Appx. at 111. "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 399 (3d Cir. 2003). "[E]xecutive action violates substantive due process only when it shocks the conscience." *Id.* at 399–400.

As explained regarding plaintiffs' assertions under the Contracts Clause, the City had legitimate interests in increasing the long-term housing supply and reducing public nuisances. Ordinance 19-077 rationally furthers those interests by removing short-term rentals, which reduced the long-term housing supply and made public nuisances more likely. The Ordinance passes rational basis review.

 Plaintiffs assert that Mayor Fulop and the City Council passed the Ordinance to punish Airbnb for its late campaign donations and to benefit trade unions. (DE 10 at 24.) Plaintiffs do not substantiate these claims sufficiently to demonstrate "egregious official conduct" as explained in Section II.b.iii, *supra*. More to the point, the public purposes of the Ordinance were stated by its proponents and are obvious on its face.

The motion to dismiss is **GRANTED** as to the plaintiffs' Substantive Due Process claims.

### e. Procedural Due Process Clause

Finally, the Plaintiffs assert that Ordinance 19-077 violates their due process rights by failing to provide a remedial procedure for the deprivation of their property. (DE 10 at 24–25.) Procedural due process claims are subject to a two-stage analysis: (1) are "the asserted individual interests . . . encompassed within the fourteenth amendment's protection of 'life, liberty, or property?'" and (2) do the procedures available provide a plaintiff whose interests are deprived

36

"due process of law?" *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984). Remedial procedures are constitutionally inadequate if they "contain a defect so serious [as to] characterize the procedures as fundamentally unfair." *Giuliani v. Springfield Twp.*, 238 F. Supp. 3d, 670, 690 (E.D. Pa. 2017).

"'[A] state provides constitutionally adequate procedural due process when it provides reasonable remedies to rectify a legal error by a local administrative body.'" *Giuliani v. Springfield Twp.*, 726 Fed. Appx. 118, 122 (3d Cir. 2018). "Thus, 'when a state affords a full judicial mechanism with which to challenge the administrative decision in question,' [it] provides adequate procedural due process, whether or not the plaintiff avails himself or herself of the provided appeal mechanism." *Id.*; *see also Custin v. Wirths*, 2020 WL 1466352, 2020 U.S. Dist. LEXIS 52318 at *20 (D.N.J. Mar. 25, 2020); *DeBlasio v. Zoning Bd. Of Adjustment for Twp of West Amwell*, 53 F.3d 592, 597 (3d Cir. 1995).

Plaintiffs complain that there is no provision in Ordinance 19-077 which creates a remedial procedure for the deprivation of their property interests. (DE 10 at 24–25.) The model of procedural due process is a poor fit for a challenge to the substance of a municipal ordinance of general applicability. But no matter. As it happens, New Jersey, provides that courts may review New Jersey municipal ordinances pursuant to Article VI, Section V, paragraph 4 of the New Jersey Constitution. *Hills Development Company v. Bernards*, 103 N.J. 1, 44–45 (N.J. 1986). Furthermore, any fines issued by Jersey City municipal courts pursuant to Ordinance 19-077 could be appealed to the New Jersey Law Division under New Jersey Court Rules 7:13-1 and 3:23-1. *State v. Diaz*, 2008 WL 4345847, 2008 N.J. Super. Unpub. LEXIS 244 at *3 (N.J. App. Div. Sept. 25, 2008). There are therefore several adequate procedural methods available to the plaintiffs.

The motion to dismiss is therefore **GRANTED** as to plaintiff's Procedural Due Process claim.

### III.    Preliminary Injunction and Temporary Restraining Order

Because I have granted Jersey City's motion to dismiss as to all of plaintiffs' counts, I deny plaintiffs' motions for a preliminary injunction and temporary restraining order as moot. *See Argen v. Kessler*, 2018 WL 4676046, 2018 U.S. Dist. LEXIS 168238 at *32 (D.N.J. Sept. 28, 2018). I have examined the complaint, and found that it fails to state a claim. Even as supplemented by the arguments in favor of the preliminary injunction motion, it fails to set forth an adequate showing of likelihood of success on the merits.

## IV.   Conclusion

For the reasons set forth above, I will grant Plaintiffs' motion (DE 6) to dismiss the complaint. I further deny plaintiffs' motion for a preliminary injunction and temporary restraining order.

An appropriate order follows.

Dated: March 24, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

38

# APPENDIX A

**Gennadiy and Eugene Nekrilov:**

| Property Address | Property Type | Monthly Cost | Monthly Income (Short Term Rental) | Monthly Income (Long Term Rental) |
|---|---|---|---|---|
| 385 Monmouth St. (Compl. ¶ 111.) | Lease | $4,800 | $8,389.00 | |
| 42 Mercer St. (Compl. ¶ 112) | Lease | $1,550 | $3,045 | |
| 20 Poplar St. (Compl. ¶ 113) | Lease | $2,200 | $5,700 | |
| 99 Court House Pl. (Compl. ¶ 114.) | Lease | $2,700 | $5,640 | |
| 231 Bay St. (Compl. ¶ 115) | Lease | $1,250 | $2,200 | |
| 851 Bergen Ave (Compl. 145) | Lease | $7,000 | $12,500 | |
| 16 Poplar St. (Compl. ¶ 146) | Lease | $1,850 | $4,370 | |
| 35 Alan Terrace (Compl. ¶ 147) | Lease | $1,650 | $2,483 | |
| 304 2nd Street (Compl. ¶ 148) | Lease | $4,400 | $8,117 | |
| 520 Manila Avenue (Compl. ¶ 149) | Lease | $3,000 | $6,115 | |
| 70 Astor Place (Compl. ¶ 150) | Lease | $2,000 | $4,393 | |
| 110 Prospect Street (Compl. ¶ 151) | Lease | $2,250 | $4,930 | |
| 434 West Side Avenue (Compl. ¶ 152) | Lease | $1,600 | $3,955 | |
| 160 South St. (Compl. 121) | Owned | Purchase cost: $489,000 + | $9,500 | $3,800 |

39

| | | 13,570.33 (closing costs) + $60,000 (renovation costs); $2,500 mortgage | | |
|---|---|---|---|---|
| 72 Virginia Avenue (Compl. ¶ 132) | Owned | Purchase cost: $310,000 + $10,193.66 (closing costs) + $40,000 (renovation costs); $1,725 mortgage | $5,183 | $1,800 |

**Kwan Ho Tang and Jayu Jen**

| Property Address | Property Type | Monthly Cost | Monthly Income (Short Term Rental) | Monthly Income (Long Term Rental) |
|---|---|---|---|---|
| 162 Steuben St. Apt. 1 (Compl. ¶ 189) | Lease | $2,700 | $4,500 | |
| 162 Steuben St. Apt. 3 (Compl. ¶ 194) | Lease | $3,000 | $4,500 | |
| 227 Bay St. Apt. 1B | Owned | Purchase cost: $570,500 + 16,502 (closing costs) + $32,574 (renovation costs) + $8,513 (furnishing | $4,500 | $2,600 |

| | | costs); $3,300 mortgage | | |
|---|---|---|---|---|

**Alan Suen**

| Property Address | Property Type | Monthly Cost | Monthly Income (Short Term Rental) | Monthly Income (Long Term Rental) |
|---|---|---|---|---|
| 427 Liberty Ave (Compl. ¶ 251) | Owned | Purchase cost: $428,500 + $10,195 (closing costs) + $383,000 (renovation costs) + 40k (furnishing costs); $2,500 mortgage | $ 35,657 (2017) $ 169,835.72 (2018) $176,970.21 (2019) | $10,000 total between the two properties |
| 212 Hopkins Ave (Compl. ¶ 255) | Owned | $586,734.68 + $13,307.87 (closing costs); mortgage $3,500 | $17,626.71 (2017) $82,078.57 (2018) $185,319.04 (2019) | $10,000 total between the two properties |

41